UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>For Online Publication Only</u>

-----------------------------------------------------------------------X

DONNA CIPLEY,

        Plaintiff,

-against-

COUNTY OF NASSAU,
NASSAU COUNTY POLICE DEPARTMENT,
NASSAU COUNTY DISTRICT ATTORNEY'S OFFICE,
DETECTIVE MIKE P. MAZZARA,
DETECTIVE ROBERT L. OBERG,
DETECTIVE MICHAEL A. PERNA,
DETECTIVE ELLIOT B. LICHTENSTEIN,
and DETECTIVE BASIL D. GOMEZ,
JOHN DOES AND JANE DOES 1-10,

        Defendants.

-----------------------------------------------------------------------X

**<u>MEMORANDUM & ORDER</u>**
20-cv-975 (JMA)(ST)

**FILED**
**CLERK**

5/7/2025 11:15 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

Plaintiff Donna Cipley brought this action under 42 U.S.C. § 1983 for false arrest, excessive force, failure to intervene, malicious prosecution, and fabrication of evidence. (ECF No. 1). A jury trial was held from December 2, 2024 to December 6, 2024. (ECF No. 85.) At the conclusion of trial, the jury returned a unanimous verdict, finding Defendants Mike P. Mazzara and Basil D. Gomez liable for the false arrest of Plaintiff Donna Cipley. (ECF No. 87.) The jury awarded Plaintiff $1,725,000 in compensatory damages, $125,000 in punitive damages as to Defendant Mazzara, and $150,000 in punitive damages as to Defendant Gomez. (Id.)

Presently before the Court is Defendants' motion pursuant to Federal Rule of Civil Procedure 50 to enter judgment as a matter of law in their favor, or in the alternative, for a new trial or remittitur under Rule 59. (ECF No. 96.) For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

# I.    BACKGROUND

The Court assumes familiarity with the factual background and procedural history of this case and reviews it only as relevant to the present motion.  Plaintiff's § 1983 claims arise from her March 12, 2019, arrest at her home in Levittown, New York.  (Compl., ECF No. 1.)  At the time, Plaintiff was 61 years old.  Officers from the Nassau County Police Department, including Defendants Mazzara and Gomez arrived at Plaintiff's home in search of Plaintiff's son, James Cipley Jr.  Plaintiff refused to allow the officers entry and was subsequently arrested.  Defendants filed a police report which alleged, <u>inter alia</u>, that Plaintiff was "verbally abusive," and then proceeded to "intentionally and forcefully swing the [front] door open into Detective Gomez's body with great force."  (ECF No. 102-6 ("Police Report").)  The police report also stated that Plaintiff "grabbed the right thumb of Detective Gomez and bent it back as detectives attempted to place her under arrest."  (<u>Id.</u>)  Plaintiff was charged with Assault in the 2nd Degree and Resisting arrest and was held for approximately 20 hours before being released.  On October 8, 2019, the Honorable David Goodsell, of the First District Criminal Term, dismissed all charges against Plaintiff.

Plaintiff disputed the facts as alleged in the police report, asserting that Defendants had spun this version of events to substantiate their unlawful arrest.  The above facts grounded Plaintiff's claim for damages pursuant to 42 U.S.C. § 1983 for false arrest, excessive force, failure to intervene, malicious prosecution, and fabrication of evidence.

## A.  <u>Facts Presented at Trial</u>

At trial, Plaintiff testified that on March 12, 2019, Defendants appeared at her home, demanding to speak with Jim Cipley Jr.  (ECF No. 102-7 ("Trial Transcript" or "Tr.") 475.)  Plaintiff gave testimony that the officers did not have a warrant to search her home.  (Tr. 475.)  Plaintiff then stated that, after repeatedly telling the officers to leave, she "slammed the door shut."

(Tr. 477.)  She testified that at the same moment, "Detective Gomez stuck his hand in the door," causing the door to slam onto his hand.  (Tr. 477; Tr. 503-507.)  Plaintiff then testified that Defendant Gomez screamed "it's a go, it's a go, it's a go; three times he said it. And then the next thing I knew, all the men charged into my house, I was thrown on the floor."  (Tr. 477.)  Plaintiff further recalled that Defendants put a knee into her back, and that she believed "they were going to kill me."  (Tr. 479.)  The officers then escorted Plaintiff to their car, where she was handcuffed and belted.  (Tr. 485.)  Plaintiff testified that she was in "a lot of pain, my back was hurting me really bad where he had the knee, I couldn't walk very well."  (Tr. 485.)

Subsequently, Plaintiff requested that the officers take her to the hospital, but they refused. (Tr. 485.)  Instead, the officers first took Plaintiff to the 2nd Precinct in Woodbury.  (Tr. 486.) Plaintiff then testified that the officers eventually brought her to Nassau Country Medical center, where she was given bread and water, and "something for my high blood pressure too."  (Tr. 494.) Plaintiff averred that she had a sprained ankle and bruises on her knee and arms as a result of the arrest.  (Tr. 488-491.)  Plaintiff remained in custody for the rest of the day.  (Tr. 495.)  On March 13, 2019, Plaintiff appeared before a court in "Mineola or Hempstead."  (Tr. 495.)  After this appearance, she was released from custody.  (Tr. 496 – 497.)  Plaintiff testified that on October 8, 2019, all the charges filed against her were dismissed.  (Tr. 506.)

Plaintiff asserted that, since this incident, she does not "go anywhere anymore. I have too much shame and embarrassment from what these men put me through, I'm sorry."  (Tr. 508.) Plaintiff further stated that she saw a mental health professional, Dr. Enoch Chan, who "put me on Prozac, he put me on Xanax, he put me on Ambien. He just medicated me up a lot."  (Tr. 513.) She gave testimony that she "has not slept in five years," due to "nightmares . . . that they come back – they told me they were going to get me."  (Tr. 515.)  Plaintiff's physician, Dr. Chan, further described that Plaintiff "had disturbed sleep; terminal insomnia; fatigue; very severe anxiety,

which was felt to be severely life-limiting. She had noted to be markedly more irritable and had severe anhedonia, [which is] the inability to experience joy." (Tr. 646.) Finally, Dr. Chan testified that Plaintiff had "overtones of [Post-Traumatic Stress Disorder]." (Tr. 651.)

Defendants disputed Plaintiff's account with respect to the arrest. Detective Gomez gave testimony that when the officers first arrived at Plaintiff's home, she "proceeded to berate us with curse words and insults . . . telling us to go F ourselves; get the F off my property." (Tr. 278.) Detective Gomez then testified that Plaintiff "swung the door out and the door came in contact with myself." (Tr. 280.) Detective Gomez asked her "why did you do that, and she did not reply. She replied with slamming the door into me making contact a second time." (Tr. 280.) Detective Mazzara corroborated this recollection, testifying that Plaintiff initially opened the door and "bumped it into him," and then "smashed it into Detective Gomez." (Tr. 174.) At this moment, Detective Gomez and Detective Mazzara testified that they arrested Plaintiff and that she fell to the floor. (Tr. 175-178; Tr. 281-284.) Defendants asserted that the police report was thus a true and accurate description of the incident, and that due to Plaintiff's alleged door slamming, "there was probable cause to effect the arrest." (Tr. 295; Tr. 101-104.) Defendants agreed that they did not have a warrant to enter Plaintiff's home prior to the arrest. (See, e.g., Tr. 259; Tr. 221; Tr. 99.)

## B. Rule 50(a) Motion

At the close of evidence, Defendants moved for a directed verdict pursuant to Federal Rule of Civil Procedure 50(a). (Tr. 796 - 810.) The Court allowed the jury to consider the case as to: (1) the false arrest only as to Defendants Gomez, Mazzara and Oberg; (2) excessive force only as to defendants Gomez and Mazzara; (3) failure to intervene only as to defendants Lichtenstein, Oberg, Perna, and Rubino and only as to failing to intervene in the alleged excessive force; (4) malicious prosecution only as to Gomez and Mazzara; and (5) fabrication of evidence only as to Gomez and Mazzara. (Id.) All other claims were dismissed. Subsequently, the jury found

4

Detective Gomez and Detective Mazzara liable for causing Plaintiff to be falsely arrested.  (See ECF No. 87, Jury Verdict Form.)  The jury found that Defendant Robert. L. Oberg was not liable for false arrest, and none of the Defendants were liable for excessive force, failure to intervene, malicious prosecution, or fabrication of evidence.  (Id.)

### C.  **The Instant Motion**

After the jury's verdict, Defendants renewed their Rule 50 motion and now seek judgment as a matter of law on the basis of insufficient evidence.  (See ECF No. 99 ("Def's Br.") at 11-14.) They raise the additional defense that Defendants Mazzara and Gomez and entitled to qualified immunity.  (See id. at 14-17.)  In the alternative, Defendants request that the Court set aside the verdict and order a new trial or remittitur under Rule 59.  (See id. 17-29.)

## II.    LEGAL STANDARDS

### A.  **Judgment As a Matter of Law – Rule 50**

When resolving a Rule 50 motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000).  "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."    Id. "Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) (citing Scott v. Harris, 550 U.S. 372, 378-80 (2007)).  On genuine factual disputes, however, the court cannot "substitute its judgment for that of the jury." Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir.

1988); accord Herrera-Amador v. Lee, No. 16-CV-5915, 2024 WL 2316134, at *3 (E.D.N.Y. May 22, 2024).  Additionally,

> [A] party is not entitled to challenge on appeal the sufficiency of the evidence to support the jury's verdict on a given issue unless it has timely moved in the district court for judgment as a matter of law on that issue. Such a motion must be made "before submission of the case to the jury." Fed. R. Civ. P. 50(a)(2). Since the purpose of requiring that the motion be made before submission of the case to the jury is "to give the claimant a fair opportunity to cure the defects in proof," the motion "must at least identify the specific element that the defendant contends is insufficiently supported." For the same reason, although a motion for [judgment as a matter of law ("JMOL")] may be "renew[ed]" after the jury returns its verdict, see Fed. R. Civ. P. 50(a)(2), it may be renewed only on grounds that were specifically articulated before submission of the case to the jury[.]

Kirsch v. Fleet St., Ltd., 148 F.3d 149, 164 (2d Cir. 1998) (cleaned up).

### B.  Motion for a New Trial – Rule 59

Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure provides that a "[t]he court may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A).  Rule 59(a)(1)(A) permits a court to grant a new trial "[if] the verdict is against the weight of the evidence."  See Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 417 (2d Cir. 2012).  "[A] decision is against the weight of the evidence . . . if and only if the verdict is [(1)] seriously erroneous or [(2)] a miscarriage of justice."  Id. at 417-18 (citing Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 635 (2d Cir. 2002)).  "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  Medforms, Inc. v. Healthcare Mgmt. Sols., Inc., 290 F.3d 98, 106 (2d Cir. 2002) (internal quotation marks omitted).

In considering a Rule 59 motion on the issue of damages, courts may "order[ ] a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)."  Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433, 116 S.Ct. 2211, 135

L.Ed.2d 659 (1996); see also Stampf v. Long Island R. Co., 761 F.3d 192, 204 (2d Cir. 2014) ("Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.") (internal quotation marks and citation omitted).  Under Federal law, remittitur is appropriate where a jury award "is so high as to shock the judicial conscience." Kirsch, 148 F.3d 149 at 165.

### C. **False Arrest**

"In analyzing claims alleging the constitutional tort of false arrest, '[courts] have generally looked to the law of the state in which the arrest occurred.'" Russo v. City of Bridgeport, 479 F.3d 196, 203 (2d Cir. 2007) (citing Jaegly v. Couch, 439 F.3d 149, 151–52 (2d Cir. 2006)); see also Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) ("A § 1983 claim for false arrest [or false imprisonment], resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law.")

"Under New York law, a false arrest claim requires a plaintiff to show that the defendant intentionally confined him without his consent and without justification." Dancy v. McGinley, 843 F.3d 93, 107 (2d Cir. 2016) (internal quotation marks omitted).  Probable cause "is an absolute defense" and "exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Id. (internal quotation marks omitted).  Probable cause is determined based on the facts known to the arresting officer at the time of the arrest. See Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016).

### III.    DISCUSSION

Defendants argue that the jury's verdict finding Detectives Gomez and Mazzara liable for falsely arresting Plaintiff must be set aside, and judgment entered in their favor.  For the following

reasons, Defendants motion for judgment as a matter of law under Rule 50 or for a new trial under Rule 59 is DENIED.  However, the Court GRANTS Defendants' request for remittitur of the jury's compensatory damages award.

## A. <u>Sufficiency of Evidence</u>

Defendants first argue that the Court should enter judgment as a matter of law pursuant to Rule 50 because the evidence was insufficient to find Defendants Gomez and Mazzara liable for false arrest.  Defendants assert that because the jury found that:

> defendants did not fabricate evidence; did not maliciously prosecute plaintiff; did not use excessive force; and did not fail to intervene, the jury necessarily believed Detective Gomez and Massaro's [sic][1] version of events and did not believe plaintiff; they can only have acted out of sympathy; convenience; or under a misunderstanding or misapplication of the law.

(Def's Br. at 14.)  Defendants assert that "[i]f there was insufficient evidence to support a finding as to all the other claims – and specifically fabrication of evidence - there was necessarily insufficient evidence to support a finding of false arrest, and that claim should be dismissed as well."[2]  (Id.)  The thrust of Defendants' argument is that because the jury found that the police report was not fabricated evidence, it could not find that Defendants Gomez and Mazzara "lacked probable cause" to arrest Plaintiff.  (Def's Reply at 7.)  According to Defendants, the "sole probable cause relied upon by the defendant officers was that plaintiff twice intentionally pushed her screen door into Detective Gomez as she was going back into her house while the detectives were there

---

[1]    Throughout Defendants briefs, they appear to misspell Defendant Mazzara's name as "Massaro."

[2]    Although this argument may appear to express Defendants' belief that the jury rendered an inconsistent verdict, they assert "that is not Defendants' argument."  (ECF No. 101 ("Def's Reply") at 11.)  Nor could it be.  As is well established in this Circuit, "a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury."  <u>Kosmynka v. Polaris Indus., Inc.</u>, 462 F.3d 74, 83 (2d Cir. 2006); <u>accord</u> <u>DiBella v. Hopkins</u>, 403 F.3d 102, 117 (2d Cir. 2005).  Here, Defendants failed "to preserve [an] objection to the jury's purportedly inconsistent verdicts, because they did not object to the jury's verdict after it was delivered and before the jury was discharged."  <u>Lin v. Rising Sun Rest., Inc.</u>, No. 17-CV-1044, 2025 WL 373461, at *4 (E.D.N.Y. Feb. 3, 2025).  The Court therefore construes Defendants' assertion as an argument that the evidence was insufficient as to the false arrest claims against Defendants Gomez and Mazzara.

properly looking for her son and then subsequently resisted arrest and further assaulted Detective Gomez." (Id. at 12.) This version of events was the one attested to by the police report. (See Police Report.) Accordingly, Defendants conclude that the jury must have found that there was probable cause to arrest Plaintiff, which defeats her false arrest claim. (Def's Br. at 14.)

As Plaintiff correctly points out, however, this argument "proves too much." (ECF No. 100 ("Pl's Opp'n") at 17.) Although the jury did not find Defendants liable for fabrication of evidence, that does not necessarily imply that it believed there was probable cause for the arrest. As the Court explained in instructing the jury, a fabrication of evidence claim contains four elements: (1) Defendant officer communicated a false statement; (2) Defendant officer forwarded the false statement to prosecutors; (3) the false statement was likely to influence a jury's decision; and (4) the Plaintiff suffered a deprivation of life, liberty, or property as a result of the Defendant officer's actions. (See ECF No. 84 at 14.) Defendants erroneously conclude that the "only issue" for the jury on this claim was the first element: "whether the officers' fabricated information; the only information allegedly fabricated was the probable cause that led to plaintiff's arrest." (Def's Br. at 13.) Not so. The jury could have found that Plaintiff did not satisfy her burden of proof on the second, third, or fourth elements. For example, as Plaintiff asserts, the jury could have found that Defendants' statements were not likely to influence a jury's decision in her criminal case because Plaintiff "committed one of the acts inside the home alleged in the Felony Complaint.[3]" (Pl's Opp'n at 19); see also Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004) ("In cases 'where the special verdict answers appear to be inconsistent but there is a view of the case that makes the jury's answers consistent, they must be resolved that way.'") (quoting Tolbert v.

---

[3]    Plaintiff is likely referring to her grabbing "the right thumb of Detective Gomez and ben[ding] it back as detectives attempted to place her under arrest." (Police Report.)

9

Queens Coll._, 242 F.3d 58, 74 (2d Cir. 2001.))  Thus, Defendants' argument on this point must be rejected.

Moreover, even if the Court were to credit Defendants' view and accept that the jury found that Defendants did not communicate a false statement, there still would be sufficient evidence for the false arrest verdict.  In instructing the jury on the law of fabrication of evidence, the Court stated that Plaintiff must prove by a preponderance of the evidence that:

> the Defendant officer communicated a false statement. A statement is false if it was untrue when made and known at the time of making to be untrue by the person making it. A mere mistake, or misinformation, contained in a written record is not a basis for finding a constitutional violation. Plaintiff must prove that the Defendant intentionally communicated a false statement.

(ECF No. 84 at 14.); accord Garnett v. Undercover Officer C0039, 838 F.3d 265, 278 (2d Cir. 2016).  The police report states in relevant part that Plaintiff "intentionally bumped" the door into Detective Gomez and then "intentionally and forcefully swung the door open into Detective Gomez."  (Police Report.)  The crux of the issue here is that Plaintiff asserts that she did not intentionally slam the door on Detective Gomez, while Defendants argue she did.  (Compare Tr. 502 – 503 (Plaintiff rejecting the notion that she "intentionally bumped [the door] into Detective Gomez.") with Tr. 93 (Detective Gomez stating that he believed Plaintiff's slamming the door on his hand was "actually intentional."))  A jury, however, could have reasonably found that Plaintiff only intended to slam the door, but not hit Detective Gomez.  The jury could have also found that Defendant Gomez placed his hand in the door with the intention to be hit – providing a pretext to enter the home.  The police report's highly general recounting of the events forecloses neither interpretation. As described above, the report details the incident at several levels of generality above the total record presented to the jury and does not parse the meaning of the word "intentionally."   Accordingly, there was sufficient evidence for the jury to conclude that

Defendants did not have probable cause to arrest Plaintiff, while also finding that Defendants did not fabricate evidence in the police report. The Court thus rejects Defendants' argument.

### B. **Qualified Immunity**

Defendants next seek judgment as a matter of law on the grounds that they were entitled to qualified immunity. (Def's Br. at 14-16.)

A police officer is entitled to qualified immunity from liability for "'his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act.'" Simpson v. City of New York, 793 F.3d 259, 268 (2d Cir. 2015) (quoting Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001)). "An officer need only have 'arguable probable cause,' which exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Simpson, 793 F.3d 259 at 268 (quoting Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004)).

Defendants assert that there was arguable probable cause here. (Def's Br. at 16) ("[E]ven if the jury somehow credited plaintiff's version only as to this claim, the defendants would be protected under qualified immunity as Detective Massaro[sic] had arguable probable cause.") The whole of Defendants' argument is that there was "obviously arguable probable cause" because Detective Mazzara "observed the door being slammed on his partner's hand" and then "observed plaintiff struggling during her lawful arrest." (Id.) According to Defendants, even accepting Plaintiff's version of events, the door slamming was sufficient for arguable probable cause as to Defendant Mazzara.[4]

---

[4]    Defendants do not seem to argue that Defendant Gomez had arguable probable cause to effectuate the arrest. They appear to operate under a mistaken assumption that all "the defendants would be protected under qualified

Defendants' argument fails here, however, "because it was not properly raised during trial." Herrera-Amador, 2024 WL 2316134, at *6. As is well established, post-trial motions are "limited to those grounds that were specifically raised in the prior motion for [judgment as a matter of law]; the movant is not permitted to add new grounds after trial." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 286 (2d Cir. 1998). At the close of evidence, Defendants moved for judgment as a matter of law pursuant to Rule 50(a). (See Tr. 796 - 810.) Nowhere in this colloquy did Defendants raise a qualified immunity defense. It was not until their renewed motion under Rule 50(b) that Defendants raised qualified immunity, but at this point the defense was waived. See Toliver v. New York City Dep't of Corr., 202 F. Supp. 3d 328, 336-37 (S.D.N.Y. 2016) ("[B]ecause Defendants did not specifically include a qualified immunity argument in their pre-verdict request for judgment as a matter of law, they are precluded from including such an argument in their post-verdict motion."); Provost v. City of Newburgh, 262 F.3d 146, 161 (2d Cir. 2001) ("We need not resolve the merits of Roper's qualified immunity argument, however, because he forfeited any right to judgment under Rule 50 on this basis.")

Defendants mischaracterize Plaintiff's argument on this point, asserting that "plaintiff argues that defendants forfeited their properly plead affirmative defense of qualified immunity because no special interrogatories were given to the jury." (Def's Reply at 11.) Rather, Plaintiff asserts that Defendants forfeited any qualified immunity argument because "[t]hey did not specify in their Rule 50(a) argument the facts supporting their entitlement to qualified immunity or submit special interrogatories addressing their entitlement to qualified immunity." (Pl's Opp'n at 13.) (emphasis added). Plaintiff included both failures because "[s]ome courts have excused failure to

---

immunity as Detective Massaro [sic] had arguable probable cause." (Def's Br. at 16.) The Court, however, would need to determine whether qualified immunity exists as to each Defendant. See Drimal v. Tai, 786 F.3d 219, 226 (2d Cir. 2015) (when evaluating a qualified immunity defense, "the district court must consider the actions of each individual defendant.")

follow the proper procedure under Rule 50 when they submit special interrogatories on factual issues relevant to qualified immunity." Herrera-Amador, 2024 WL 2316134, at *7 (citing Harewood v. Braithwaite, 64 F. Supp. 3d 384, 395 n.11 (E.D.N.Y. 2014)). Those authorities do not help Defendants here, however, as they failed to submit special interrogatories to the jury. See Id. (denying Rule 50(b) qualified immunity defense where "[t]here is no indication from the colloquy between the court and defense counsel that Defendants intended to maintain their qualified immunity defense.") Thus, the Court rejects Defendants' argument that they are entitled to judgment as a matter of law pursuant to qualified immunity.

### C. **Motion for A New Trial**

Defendants largely reiterate the same arguments for their motion for a new trial under Rule 59. For the following reasons, the Court declines to grant the motion for a new trial pursuant to Rule 59 (a)(1)(A).

"In contrast to a motion for judgment as a matter of law, a motion for a new trial pursuant to Fed. R. Civ. P. 59 may be granted by the district court, although there is evidence to support the jury's verdict, so long as the district court determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005). Defendants again assert that "[t]he jury then found for defendants on every claim except false arrest as to defendants Gomez and Massaro[sic]. This verdict is seriously erroneous as plaintiff must have been found incredible on her claims and it was only her testimony that made out any semblance of a false arrest charge . . ." (Def's Br. at 18.) The Court has already addressed the substance of this argument and finds that any perceived inconsistency in the jury's verdict is insufficient to grant the motion for a new trial. (See supra Section III.A.)

Defendants also contend that "the officers were largely consistent as to what occurred in the arrest of the plaintiff; no significant inconsistencies or falsehoods were elicited during plaintiff's examination of them so that there was also an abundance of testimonial evidence lending doubt to the credibility of plaintiff." (Def's Br. at 19.) (internal quotations omitted). Specifically, Defendants assert:

> Plaintiff's version of events [] was incredulous as a matter of law she alleged that Detective Gomez intentionally placed his hand in the door jamb when she slammed it shut, yet the photos of his hand taken that day show no bruising on the back of his hand or his palm as you would expect had he had his hand caught in the door jamb.

(Id.) Moreover, Defendants take issue with Plaintiff's description of the arrest as the evidence documenting Plaintiff's injuries are not "anywhere near the severity of injury one would expect from the attack described by the plaintiff." (Id. at 20.) Thus, Defendants conclude that allowing the verdict to stand "would be a miscarriage of justice to all the defendants who were otherwise fully exonerated by the jury." (Id. at 21.)

The Court rejects this argument on several grounds. First, even accepting arguendo that the officers were "largely consistent as to what occurred in the arrest of plaintiff," the officers' testimony does not exonerate them. As described at trial, Plaintiff admits that she "started to slam the door," and at that moment Detective Gomez "decided to stick his hand in the door." (Tr. 505.) As articulated above, there was sufficient evidence to find that Detective Gomez purposely stuck his hand in the door to create pretext for entry into the home. (See Tr. 226-232) (Plaintiff's counsel questioning Defendant Gomez on whether he "positioned [himself] so that the door would hit [him] . . .") On this point, "the resolution of the issues depend[s] on assessment of the credibility of the witnesses" and in the context of a Rule 59 motion, "it is proper for the court to refrain from setting aside the verdict and granting a new trial." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012).

Second, with respect to the photographic evidence, Defendants are wrong that it discredits Plaintiff's recounting of the events or her injuries.  In contrast to Defendants' assertions, the Court finds that Plaintiff's mugshot and the photos of her injuries do in fact "reflect someone who was treated in the manner she testified to."  (Def's Reply at 8; <u>see also</u> ECF No. 102-4; ECF No. 102-5.)  Moreover, the photo of Detective Gomez's thumb does not offer much proof for Defendants' claim that the scratch and swelling is "consistent only with Det. Gomez's testimony about plaintiff grabbing his hand and pulling back his thumb . . ."  (<u>Id.</u> at 9.)  It strains credulity to believe that these two photos <u>could only</u> be consistent with Defendants' assertion that his thumb was pulled back, when both parties testified that the same hand was also hit by the door.  Again, Defendants ask this Court to disturb the credibility and evidentiary assessments of the jury, which should only be done "when the jury's verdict is egregious."  <u>Green v. Groneman</u>, 634 F. Supp. 2d 274, 277–78 (E.D.N.Y. 2009).  The Court declines to engage in Defendants' speculative and altogether incredible interpretations of the evidence, and therefore declines to order a new trial.

### D. <u>Remittitur</u>

Finally, Defendants request that even if the Court upholds the verdict under Rule 50(b) and Rule 59(a)(1)(A), it should order a new trial based on the jury's "excessive" damages award.  (<u>See</u> Def's Br. at 21.)  As stated above, a court may compel a plaintiff to choose between reduction of an excessive verdict and a new trial, known as remittitur, where a jury award "is so high as to shock the judicial conscience.[5]"  <u>Kirsch</u>, 148 F.3d 149 at 165.  Defendants contend that the

---

[5]    Defendants mistakenly argue in their opening brief that the Court should apply the remittitur standard under New York law, pursuant to N.Y. Civil Practice Law and Rules ("CPLR") § 5501(c).  (Def's Br. at 22.)  The state standard is whether the award "deviates materially from what would be reasonable compensation," compared to the federal "shocks the conscience" standard.  In their reply brief, Defendants state that these standards "are essentially the same, but defendants will adopt for purposes of this argument, the 'shocks the conscience' standard."  (Def's Reply at 12.)  The Court will proceed under the federal standard, given that Plaintiff's false arrest claims arise under federal law.  <u>See</u> 42 U.S.C. § 1983.  The Court also notes that the standards are not "essentially the same."  <u>See</u> <u>In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.</u>, 739 F. Supp. 2d 576, 595 (S.D.N.Y. 2010) ("'[The New York] standard is less deferential to the jury and thus more favorable to the party challenging the award than is the

compensatory damages award should be remitted to $100,000, and the punitive damages award should be reduced to $5,000 per Defendant.  (Def's Br. at 26, 29.)  For the reasons that follow, the Court grants Defendants' motion for remittitur in part.  The Court remits Plaintiff's $1,725,000 compensatory damages award to $750,000 and upholds the punitive damages awards of $125,000 against Detective Mazzara and $150,000 against Detective Gomez.

    1.  <u>Compensatory Damages</u>

To determine whether an award is so high as to "shock the judicial conscience," the Court must "'consider[ ] . . . the amounts awarded in other, comparable cases.'"  <u>Tretola v. Cnty. of Nassau</u>, 14 F. Supp. 3d 58, 80 (E.D.N.Y. 2014) (quoting <u>DiSorbo v. Hoy</u>, 343 F.3d 172, 183 (2d Cir. 2003).)  A court should determine whether the award is "within a reasonable range," not just "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater."  <u>Id.</u> (quoting <u>Ismail v. Cohen</u>, 899 F.2d 183, 186 (2d Cir. 1990.)  Additionally, "[i]n the compensatory damages context, the Second Circuit has adopted the 'least intrusive standard' for remittitur, which holds that 'a district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive.'"  <u>Herrera-Amador</u>, 2024 WL 2316134, at *8 (quoting <u>Earl v. Bouchard Transp. Co.</u>, 917 F.2d 1320, 1328 (2d Cir. 1990.))

Here, the jury awarded Plaintiff $1,725,000 in compensatory damages for the false arrest and confinement.  (<u>See</u> Jury Verdict Form.)  Given the details of this case, the Court finds that this award shocks the conscience.

Plaintiff argues the emotional damages she suffered are "egregious," and should be compensated as such.  (<u>See</u> Pl's Opp'n at 24) (citing <u>Sooroojballie v. Port Auth.</u>, 816 Fed. App'x

---

federal 'shocks the conscience' [standard]."')  (quoting <u>Gasperini v. Center for Humanities, Inc.</u>, 149 F.3d 137, 140 (2d Cir. 1998)).

536, 546 (2d Cir. 2020) (describing "egregious" emotional distress claims as those that "yield the highest awards and are warranted only where the employer's conduct was outrageous and shocking or affected the physical health of the plaintiff.")) Even accepting that Plaintiff's emotional distress was in fact egregious, the Court cannot find any precedent to ground the jury's award of $1,725,000. Neither, does it seem, can Plaintiff. As Defendants point out, even the cases Plaintiff cites only establish a compensatory damages award of $579,112.88 (in 2025 dollars[6]) at the high end in the context of a false arrest and attendant emotional damages. (See Pl's Opp'n at 13-14; Def's Reply at 14) (citing Martinez v. Port Auth. of N.Y. & N.J., No. 01 CIV. 721, 2005 WL 2143333, at *22 (S.D.N.Y. Sept. 2, 2005), aff'd sub nom. Martinez v. The Port Auth. of New York & New Jersey, 445 F.3d 158 (2d Cir. 2006); Gardner v. Federated Dep't Stores, Inc., 907 F.2d 1348 (2d Cir. 1990); Graham v. City of New York, 128 F.Supp.3d 681, 714 (E.D.N.Y. 2015).)

In Martinez, Judge Kevin P. Castel found that an award of $160,000 ($257,383.50 in 2025 dollars) was appropriate for loss of liberty damages where the plaintiff was falsely arrested "and remained in law enforcement custody for approximately 19 hours before release." 2005 WL 2143333, at *1, 21 (S.D.N.Y. Sept. 2, 2005.) Additionally, the court found that $200,000 ($321,729.38 in 2025 dollars) in emotional distress damages did not shock the conscience, even though plaintiff was "not subject to a physical assault," because the jury credited his testimony that "he experienced considerable anguish because of his arrest . . . includ[ing] sleeplessness, loss of appetite, anxiety bouts, cessation of social, volunteer, and church activities, ideations of suicide, and concerns about his immigration status." 2005 WL 2143333, at *22.

---

[6]      In Martinez, the Court remitted Plaintiff's compensatory damages award for false arrest and emotional damages to $360,000. See 2005 WL 2143333, at *22. According to the Bureau of Labor Statistics website, that sum has the same buying power as $579,112.88 in April 2025 dollars. See U.S. BUREAU OF LAB. STAT., CPI Inflation Calculator (last accessed Apr. 25, 2025.) https://www.bls.gov/data/inflation_calculator.htm. See also Jennings v. Yurkiw, 18 F.4th 383, 393 n.7. (2d Cir. 2021) (using the Bureau of Labor Statistics CPI Inflation Calculator to assess prior damages awards accounting for inflation.)

Here, the Court recognizes that the jury similarly credited Plaintiff's testimony regarding her extensive emotional distress and does not seek to disturb its findings.  Rather, the Court puts the emotional distress damages in context.  Like Martinez, Plaintiff here experienced a host of psychological pain and suffering after a false arrest and confinement of a similar length.  (See Tr. 506-515; Tr. 644-651.)  Moreover, Plaintiff had extensive testimony from her physician substantiating her condition.  See Sooroojballie, 816 Fed. App'x 536 at 546 (holding that egregious emotional distress claims "generally contain evidence of debilitating and permanent alterations in lifestyle" corroborated by mental health professionals.) (quoting Menghi v. Hart, 745 F. Supp. 2d 89, 107 (E.D.N.Y. 2010)).  Finally, unlike in Martinez, Plaintiff here was subject to a physical assault during her arrest, even if the jury did not find Defendants liable for excessive force.  These factors weigh in favor a larger award than Martinez.  Based on the foregoing, the Court finds that the "maximum amount" Plaintiff can be awarded here without shocking the conscience is $750,000.00.

2.  Punitive Damages

With respect to punitive damages, the Supreme Court provides three "guideposts" that indicate an award is excessive: (1) the reprehensibility of the conduct, (2) the ratio of punitive damages to actual harm, and (3) comparable civil or criminal sanctions available.  See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574-75 (1996).  "The Second Circuit interpreted Gore to support, in the context of punitive damages, an 'increased judicial readiness to curtail any excessiveness.'" Herrera-Amador, 2024 WL 2316134, at *8 (quoting Payne v. Jones, 711 F.3d 85, 96 (2d Cir. 2013.))  The Court must also keep in mind that the purpose of punitive damages is to "punish the defendant for his willful or malicious conduct and to deter others from similar behavior." Memphis Cmty. Sch. Dist. v. Stadium, 477 U.S. 299, 307 n. 9 (1986).  In a § 1983 action, the jury may assess punitive damages when "the defendant's conduct is shown to be

18

motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983).

Additionally, "the Second Circuit has indicated in police misconduct cases that a punitive damages award against an individual officer in the range of $125,000 to $175,000 would be 'substantial,' and the Court has implicitly considered such an award to be a rough upper range for punitive damages against any one defendant officer." Martinez v. City of New York, No. 16-CV-79, 2023 WL 4627739, at *18 (E.D.N.Y. July 19, 2023) (citing Payne, 711 F.3d at 105.) The Circuit, however, has also made clear that "courts must adjust previous awards for inflation before comparing those awards with the jury's award in the case before them." Jennings, 18 F.4th 383 at 393 n.7. The Court proceeds with these factors in mind.

Defendants assert here that the Gore factors weigh in their favor. They contend that Defendants' acts were not that reprehensible, given that the "jury found that the defendants did not fabricate evidence; did not use excessive force; and were not malicious in their prosecution of plaintiff. There is no evidence of an evil motive or reckless disregard for plaintiff's Constitutional rights as the jury found that the defendants did not fabricate evidence." (Def's Br. at 28.) Additionally, pursuant to the third factor, Defendants argue "[t]he most likely criminal charge that defendants could have faced for falsely arresting plaintiff would be unlawful imprisonment in the second degree for 'restrain[ing] another person' . . . Unlawful imprisonment is a class A misdemeanor under New York law, punishable by a one-year sentence and/or a $1,000 fine." (Id.) (citing Drayton v. City of New York, No. 17-CV-7091, 2022 WL 16948769, at *6 (E.D.N.Y. Nov. 15, 2022)). For those reasons, Defendants seek remittitur down to $5,000 per Defendant.

The Court rejects Defendants' arguments for remittitur as to punitive damages. First, the Court finds that Defendants' conduct with respect to the arrest was indeed reprehensible. In assessing the degree of reprehensibility, the Court can consider "whether a defendant's conduct

was violent or presented a threat of violence" and "whether a defendant acted with deceit or malice as opposed to acting with mere negligence." Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996); see Jennings, 18 F.4th at 390. Here, Defendants came to Plaintiff's home without a warrant and demanded to search the home for Plaintiff's son. Plaintiff refused, and several times asked Defendants to leave her property. Instead of leaving, Defendants stood in the doorway and continued to pester Plaintiff. As the jury found, Defendants then effectuated an arrest without probable cause in violation of Plaintiff's Fourth Amendment rights. Plaintiff was physically harmed during this false arrest. Moreover, "[t]he fact that the jury awarded considerable compensatory damages demonstrates that they accepted most, if not all, of plaintiff's proffered evidence concerning the nature of plaintiff's injuries." Shuford v. Cardoza, No. 17-CV-6349, 2023 WL 2706255, at *16 (E.D.N.Y. Mar. 30, 2023). Altogether, the Court finds that Defendants acts are reprehensible and warrant punitive damages.

The second Gore factor also weighs in favor of upholding the punitive damages award. With respect to this factor, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 426 (2003). In this regard, "'[c]ourts often consider the ratio of the punitive damages award to the compensatory award and consider whether that ratio is reasonable in the circumstances of the case.'" Shuford, 2023 WL 2706255 at *16 (quoting Magalios v. Peralta, No. 19-CV-6188, 2022 WL 407403, at *2 (S.D.N.Y. Feb. 10, 2022)). Here, the punitive damages awards of $125,000 and $150,000 represent less than 10% of the jury's compensatory damages verdict – and approximately 20% of the remitted award. This ratio is reasonable and proportionate to Plaintiff's harm and the general damages award. See, e.g., Gore, 517 U.S. at 581 (noting that "even though a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line,' it did not 'cross the line into

the area of constitutional impropriety'") ; <u>Jennings</u>, 18 F.4th at 392 ("we see nothing untoward about the 1:4 ratio between compensatory and punitive damages.")

Next, Defendants argue that the comparable criminal penalty for their actions is "a class A misdemeanor under New York law, punishable by a one-year sentence and/or a $1,000 fine." (Def's Br. at 28.) As Plaintiff correctly notes, however, pursuant to federal law, "Congress has authorized a fine for violation of [Section 1983] of up to $250,000." (Pl's Opp'n at 28-29) (quoting <u>Anderson v. Aparicio</u>, 25 F. Supp. 3d 303, 312 (E.D.N.Y. 2014), <u>aff'd and remanded sub nom.</u> <u>Anderson v. Cnty. of Suffolk</u>, 621 F. App'x 54 (2d Cir. 2015) (citing 18 U.S.C. 3571(b)(3))). <u>See also</u> <u>Jennings</u>, 18 F.4th 383, 393 (2d Cir. 2021) ("Where a jury imposes punitive damages for a violation of § 1983 . . . Congress has authorized a fine for violation of this section of up to $250,000.") Given that Plaintiff's false arrest is a violation of § 1983, the comparable sanction is up to $250,000, far more than the punitive damages award here. Thus, this factor also weighs in favor of upholding the jury's award.

Finally, unlike the argument for the jury's compensatory damages award, Plaintiff here cites to several cases upholding punitive damages awards ranging from $75,000.00 to $204,937.00 (in 2025 dollars) for individual officer misconduct including unlawful search and false arrest. (<u>See</u> Pl's Opp'n at 29-30) (citing <u>McClarin v. City of New York</u>, No. 16-CV-6846, 2023 WL 5831059, at *8 (E.D.N.Y. Sept. 8, 2023) (upholding punitive damages awards of $75,000, $125,000, and $150,000 against each officer); <u>Alla v. Verkay</u>, 979 F. Supp. 2d 349, 375 (E.D.N.Y. 2013) (finding <u>in 2013</u> that "punitive damages awards of $150,000 are not excessive.") (emphasis added); <u>Martinez</u>, 2023 WL 4627739, at *18 (upholding punitive damages awards of $100,00 per defendant); <u>see also</u> <u>Shuford</u>, 2023 WL 2706255, at *18 (remitting punitive damages from $500,000 to $250,000 per defendant.) The respective $125,000 and $150,000 awards here are thus

within the range of similar cases and are not excessive.  The Court does not order remittitur on these damages.

## IV.    CONCLUSION

For the reasons set forth above, the Court DENIES Defendants' motion for a judgment as a matter of law or for a new trial.  The Court GRANTS Defendants' motion for remittitur as to compensatory damages.  Because the Court finds the compensatory damages award excessive, the Court grants a new trial on the issue of compensatory damages only, unless plaintiff accepts a remittitur of the compensatory damages awarded from $1,725,000 to $750,000.  The Court upholds the jury's punitive damages award of $125,000 against Detective Mazzara and $150,000 against Detective Gomez.

By June 23, 2025, Plaintiff's counsel shall file written notice via ECF of whether Plaintiff will accept the remitted awards.  If Plaintiff elects to have a new trial on damages, the Court will schedule a conference to set a new trial date.

**SO ORDERED.**
Dated:    May 7, 2025
              Central Islip, New York

                                                            /s/ (JMA)
                                                 _____
                                                 JOAN M. AZRACK
                                                 UNITED STATES DISTRICT JUDGE